RIVER VALLEY TRUCK CENTER,
INC., Appellant,

v.

INTERSTATE COMPANIES, INC.,
d/b/a Interstate Detroit Diesel,
Respondent.

No. A03–1273.

Court of Appeals of Minnesota.

May 25, 2004.

Robert L. DeMay, Alison C. Archer, Leonard, Street and Deinard, P.A., Minneapolis, MN, for appellant.

Lee A. Henderson, Lincolnshire, LLC, Minneapolis, MN, for respondent.

Considered and decided by
PETERSON, Presiding Judge;
LANSING, Judge; and MINGE, Judge.

## OPINION

PETERSON, Judge.

Appellant River Valley Truck Center, Inc. (River Valley) is a sales/service dealer for trucks manufactured by International Truck and Engine Corporation (International) and for engines produced by Detroit Diesel Corporation (Detroit Diesel). Respondent Interstate Companies, Inc., d/b/a Interstate Detroit Diesel (Interstate), is the distributor of Detroit Diesel engines and parts in and around Minnesota. After International stopped offering Detroit Diesel engines in new International trucks, Interstate notified River Valley that its Detroit Diesel service dealership agreements would not be renewed.

River Valley brought this action under the Minnesota Heavy and Utility Equipment Manufacturers and Dealers Act (HUEMDA), contending that the nonrenewal was without good cause in violation of Minn.Stat. § 352E.0681 (2002). In this appeal from a summary judgment for Interstate, River Valley argues that (a) the

district court erred because Interstate did not demonstrate it had "good cause" to nonrenew the dealerships; and (b) genuine fact issues exist, precluding summary judgment. We affirm.

## FACTS

Interstate's principal business is selling and servicing diesel engines manufactured by Detroit Diesel. Jeffrey Caswell, Interstate's president, stated in an affidavit:

3. In the engine business there is both an "on-highway" market and an "off-highway" market. In the on-highway market, engines are typically sold as part of another product—the truck—that is sold by a third party. That third party is either an original equipment manufacturer ("OEM") or its dealer network. In this case International is the OEM and River Valley is part of International's dealer network.

4. Medium duty trucks are your average delivery truck and heavy duty trucks are over-the-road trucks. Historically, medium duty trucks were sold like automobiles, as a complete package, engine included. Heavy duty trucks were more customized. The customer could choose from engines manufactured by as many as three or four different companies. The most common independent engines were those manufactured by Cummins Engine Company, Caterpillar, and Detroit Diesel Corporation. For many years International offered its customers the choice of all three of these engines.

5. In the off-highway market, the engine is typically used in an Industrial application (e.g.mining) at a specific location. Off-highway engines are sold through a mixture of direct sales and by OEM's or a dealer network. This is a much different market environment than exists for on-highway sales.

6. Interstate does not sell new engines at retail, but rather sells to other businesses that either (a) use the engine in specific applications (i.e. transit buses or mining applications) or (b) serve as OEMs for products sold by third parties.

7. Interstate's primary source of revenue is through service work and warranty work done on [Detroit Diesel] engines in all of these applications. Interstate does not do other types of repairs (i.e. body work, brake work, etc.), but limits its activities to the engine and Allison transmissions.

8. As part of its operations Interstate is authorized to establish a dealer network of businesses that can aid in the sales and service of [Detroit Diesel] engines. In the on-highway market, it has been a good business decision to encourage OEM dealers who offer [Detroit Diesel] engines in their product lines to become [Detroit Diesel] dealers. This relationship supports both the continuing sale of [Detroit Diesel] engines and the sale of replacement parts and service for those engines.

Any dealer for an OEM that offers Detroit Diesel engines as an option in its products is eligible to be a Detroit Diesel dealer. River Valley is a dealer for trucks manufactured by International, and, until October 2002, International offered the Detroit Diesel engine as an option in its trucks. River Valley operates International truck dealerships in New Ulm and Mankato, Minnesota. River Valley's Mankato operation has been an authorized overhaul dealer for two series of Detroit Diesel engines since 1994, and its New Ulm operation has been an authorized overhaul dealer for one Detroit Diesel engine series since 1997. An authorized overhaul dealer can perform all types of engine repair work, including replacement of individual internal parts and assemblies or subassem-

blies, overhauling internal assemblies or subassemblies, and overhauling a complete engine. As a Detroit Diesel dealer, River Valley is authorized to perform warranty work on Detroit Diesel engines and to buy replacement parts at dealer pricing.

River Valley also operates an International truck dealership in Glencoe, Minnesota, and an independent truck service location in Faribault, Minnesota. The Glencoe and Faribault operations have never been authorized Detroit Diesel dealers. River Valley also operates a wholly owned subsidiary, River Valley Truck Rental and Leasing, Inc., that rents and leases a fleet of about 250 to 300 trucks. About 70% of those trucks contain Detroit Diesel engines. River Valley presented evidence that losing its status as an authorized Detroit Diesel dealer would have a significant negative financial impact on its business.

Caswell testified in a deposition that Interstate has "an indirect sales responsibility to position the customer to buy a Detroit Diesel engine over competitive models in that OEM's truck." To carry out that responsibility, Interstate will "[c]all on the OEM dealer, support their sales staff, call directly on the customer, help support in sales incentive packages to the customer." Caswell stated in an affidavit that maintaining a population of products with Detroit Diesel engines in the field requires ongoing sales efforts by both Interstate and its dealers. Gerald Westman, River Valley's chief executive officer, testified in a deposition that River Valley never promoted one engine over the other and that it did not matter to River Valley what engine a customer bought.

The parties stipulated that Interstate's decision to not renew International truck dealers as Detroit Diesel authorized overhaul dealers resulted from International's decision to drop the Detroit Diesel engine as an option on all new International trucks effective October 2002. The notice to River Valley stated that the reason for nonrenewal was because the dealership would no longer be able to meet the requirements of paragraph 2.2.1 of the dealership agreement. Paragraph 2.2.1 defines the sales and promotion responsibilities of a Detroit Diesel dealer:

> Dealer shall actively and effectively promote the sale of Products and Parts to owners and users of Products and to other potential customers located in Dealer's Area of Responsibility. Dealer shall also advertise and promote its Dealer Operations and shall participate in sales, service and parts promotional programs recommended by Distributor and shall utilize and display reasonable quantities of literature and materials promoting Products and Parts.
>
> If Dealer represents an OEM, Dealer shall promote the sale, and maintain in stock an appropriate number of such OEM products equipped with Products.

"Products" is defined as "[n]ew or remanufactured engines which are or have been marketed by or for Company or its predecessor and for which Dealer is appointed by Distributor under Paragraph FIRST of this Agreement." "Parts" is defined as "[n]ew parts or remanufactured parts which are marketed by or for Company for use on, or in connection with, Products." "Company" means Detroit Diesel, "Dealer" means River Valley, and "Distributor" means Interstate.

Caswell testified that he was unaware of any specific reason why River Valley could not continue to actively and effectively promote the sale of Detroit Diesel parts and replacement engines, either new or remanufactured, to current owners of Detroit Diesel engines. Caswell also testified that Interstate has never terminated an Inter-

national dealership because the dealership sold virtually all of its trucks with non-Detroit Diesel engines. Interstate currently does not collect data on the number of new trucks equipped with Detroit Diesel engines that a dealership sells. River Valley presented evidence that there have been dealerships that have sold few new trucks equipped with Detroit Diesel engines.

In April 2002, International sent its dealers a memorandum regarding the transition to offering only Cummins and Caterpillar engines. The memorandum included strategies for successfully converting Detroit Diesel customers to Cummins or Caterpillar. International offered training to help its dealers understand the advantages of an International truck with a Cummins engine.

Not all of Interstate's authorized Detroit Diesel overhaul dealers are affiliated with an OEM. One such dealer is located in Minnesota, and counsel for River Valley stated in an affidavit that seven are located in Interstate's territory. There are currently 53 International truck dealers in North America operating as authorized Detroit Diesel overhaul dealers despite the lack of an affiliation with any OEM that offers trucks equipped with Detroit Diesel engines. None of those dealers are located in Minnesota.

Interstate moved for summary judgment, and River Valley moved for a temporary injunction. The parties agreed that the district court should treat the motions as cross-motions for summary judgment, waived trial testimony, and submitted the case to the district court for decision on affidavits. Based on its conclusion that Interstate had good cause to refuse to renew River Valley's dealership agreement, the district court denied River Valley permanent injunctive relief. The district court explained:

River Valley is an International truck dealership, selling vehicles that now come only with engines manufactured by Interstate's competitors. Since April 2002 River Valley has undertaken its obligation to participate in driving Detroit Diesel out of business. Neither Interstate nor [Detroit Diesel] should be compelled to continue to sell parts at a discount or authorize warranty work to a business whose corporate objective is the economic elimination of Interstate and/or [Detroit Diesel] from the business world.

## ISSUE

Did the district court err in concluding that Interstate had good cause to not renew River Valley's dealership agreement?

## ANALYSIS

Although the parties on appeal dispute the procedural posture of the case, the district court's order shows that it decided this case as a matter of law. The district court's order contains no factual findings, and the only facts stated in the district court's accompanying memorandum are undisputed facts. Therefore, the appropriate standard of review is that applicable to a summary judgment.

On appeal from a summary judgment, this court must ask two questions: (1) whether there are any genuine issues of material fact in dispute; and (2) whether the district court erred in applying the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). This court views the facts in the light most favorable to the party against whom judgment was granted and accepts as true the facts presented by that party. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). When the district court grants summary judgment based on the application of a statute to undisputed

facts, the result is a legal conclusion, reviewed de novo by the appellate court. *Lefto v. Hoggsbreath Enters., Inc.,* 581 N.W.2d 855, 856 (Minn.1998).

The Minnesota HUEMDA provides:

> No equipment manufacturer, directly or through an officer, agent, or employee may terminate, cancel, fail to renew, or substantially change the competitive circumstances of a dealership agreement without good cause. "Good cause" means failure by an equipment dealer to substantially comply with essential and reasonable requirements imposed upon the dealer by the dealership agreement, if the requirements are not different from those requirements imposed on other similarly situated dealers by their terms.

Minn.Stat. § 325E.0681, subd. 1 (2002). The equipment manufacturer has the burden of proving the existence of good cause to not renew a dealership agreement. *See Midwest Great Dane Trailers, Inc. v. Great Dane Ltd. P'ship,* 977 F.Supp. 1386, 1394 (D.Minn.1997) (stating that under HUEMDA, manufacturer must demonstrate good cause for any "substantial change" in conditions). The ultimate conclusion as to whether there was a violation of Minn.Stat. § 325E.0681, subd. 1, must be based on the specific facts of the case presented. *See Astleford Equip. Co., Inc. v. Navistar Int'l Transp. Corp.,* 632 N.W.2d 182, 191 (Minn.2001) (in construing "substantial change of circumstances" under Minn.Stat. § 325E.0681, subd. 1, court stated that "the ultimate conclusion as to whether there was a violation of the statute must be based on the specific facts of the case presented" and "a court should engage in a case-by-case factual inquiry in reaching its ultimate conclusion of whether there has been a substantial change in the competitive circumstances").

When interpreting a statute, the court must ascertain and effectuate the legislature's intent. Minn.Stat. § 645.16 (2002). If a statute is ambiguous, an appellate court relies on the rules of statutory construction to determine and give effect to the legislature's intent. *In Re Estate of Nordlund,* 602 N.W.2d 910, 913 (Minn. App.1999), *review denied* (Minn. Feb. 15, 2000). A statute is ambiguous if it is reasonably susceptible to more than one meaning. *Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000).

The HUEMDA defines good cause as "failure by an equipment dealer to substantially comply with essential and reasonable requirements imposed upon the dealer by the dealership agreement, if the requirements are not different from those requirements imposed on other similarly situated dealers by their terms." Minn. Stat. § 325E.0681, subd. 1. The statute then lists eight specific examples of good cause, which include a specified change in the ownership of the dealership that occurs without the equipment manufacturer's consent, which shall not be unreasonably withheld; commencement of bankruptcy, dissolution, or liquidation of the dealer; change in the location of the dealer's principal place of business; a default by the equipment dealer under a security agreement between the dealer and the equipment manufacturer or a revocation or discontinuance of a guarantee; abandonment of the business by the equipment dealer; the dealer's conviction of a felony affecting the relationship between the dealer and manufacturer; the dealer's engagement in conduct injurious or detrimental to the dealer's customers; or "[t]he equipment dealer, after receiving notice from the manufacturer of its requirements for reasonable market penetration based on the manufacturer's experience in other comparable marketing areas, consistently fails to

meet the manufacturer's market penetration requirements." *Id.,* subd. 1(a)-(h).

■ None of the eight specific examples applies to this case. Thus, to show good cause, Interstate must show that River Valley failed to substantially comply with a requirement of the dealership agreement that is (1) essential; (2) reasonable; and (3) not different from requirements imposed on other similarly situated dealers. *Id.,* subd. 1.

Paragraph 2.2.1 of the dealership agreement between Interstate and River Valley states:

> Dealer shall actively and effectively promote the sale of Products and Parts to owners and users of Products and to other potential customers located in Dealer's Area of Responsibility.... [.]

> If Dealer represents an OEM, Dealer shall promote the sale, and maintain in stock an appropriate number of such OEM products equipped with Products.

The definition of "Products" includes new and remanufactured engines. Interstate's notice of nonrenewal states that the reason for nonrenewal is because River Valley would no longer be able to meet the requirements of this contract provision. Because River Valley, a dealer, represents International, an OEM, the last sentence of paragraph 2.2.1 requires that River Valley maintain in stock an appropriate number of International products equipped with Detroit Diesel engines. But because International decided to no longer offer Detroit Diesel engines as an option in its trucks, River Valley cannot maintain in stock International trucks equipped with Detroit Diesel engines.

■ River Valley argues that because all of the specific examples of good cause in Minn.Stat. § 325E.0681, subd. 1, relate to intentional conduct by the dealer, good cause cannot be based on conduct by a third party, in this case another manufacturer for which River Valley is a dealer, over which the dealer has no control. The general definition of good cause, however, does not require intentional noncompliance. *See* Minn.Stat. § 325E.061, subd. 1 (defining "good cause" generally). This court is prohibited from adding words to a statute and cannot supply what the legislature either purposely omitted or inadvertently overlooked. *Ullom v. Indep. Sch. Dist. No. 112,* 515 N.W.2d 615, 617 (Minn. App.1994).

River Valley also argues that construing good cause to include conduct over which the dealer has no control would be inconsistent with Minn.Stat. § 325E.0682(b)(4) (2002), which states:

> It is a violation of sections 325E.068 to 325E.0684 for an equipment manufacturer to: ... attempt or threaten to terminate, cancel, fail to renew, or substantially change the competitive circumstances of the dealership agreement if the attempt or threat is based on the results of a natural disaster, a labor dispute, or other circumstance beyond the dealer's control.

But Interstate's attempt to fail to renew the dealership agreement is not based on circumstances beyond River Valley's control. River Valley cannot maintain in stock International trucks equipped with Detroit Diesel engines because International decided to no longer offer Detroit Diesel engines as an option in its trucks, which is a circumstance beyond River Valley's control. But River Valley could comply with paragraph 2.2.1 by no longer representing International. If River Valley did not represent International, it would not be required by paragraph 2.2.1 to maintain a stock of International trucks equipped with Detroit Diesel engines. Continuing to represent International is a circumstance within River Valley's control.

River Valley also argues that construing good cause to include conduct over which

the dealer had no control is inconsistent with Minn.Stat. § 325E.0681, subd. 2 (2002), which requires that, when a nonrenewal is based on the general good-cause definition or failure to meet requirements for reasonable market penetration, an equipment manufacturer must provide an equipment dealer at least 90 days' prior written notice of nonrenewal of the dealership agreement to give the dealer an opportunity to cure a claimed deficiency. River Valley argues that construing good cause to include conduct over which a dealer has no control renders the notice-and-opportunity-to-cure provision meaningless. But Interstate gave River Valley the opportunity to cure the breach of the dealer agreement by establishing a relationship with another OEM that sells Detroit Diesel engines as part of its product offering. The fact that River Valley was unsuccessful in establishing such a relationship is not equivalent to being denied the opportunity to do so.

River Valley urges this court to follow *Arneson Distrib. Co. v. Miller Brewing Co.*, 117 F.Supp.2d 905, 910 (D.Minn.2000), and construe good cause as excluding third-party conduct. *Miller Brewing* involved construction of the Minnesota Beer Brewers and Wholesalers Act, which prohibits a brewer from terminating or not renewing an agreement with a wholesaler unless the brewer satisfies notice-and-opportunity-to-cure requirements, acts in good faith, and has good cause for termination or nonrenewal. *Id.* at 908. *See* Minn.Stat. § 325B.04 (2002) (stating conditions for terminating agreements). The examples of good cause set forth in the Beer Brewers and Wholesalers Act are similar to those in HUEMDA. *Compare* Minn.Stat. § 325B.04 (2002) *with* Minn. Stat. § 325E.0681, subd. 1.

Miller had purchased several beer brands from two brewing companies. 117 F.Supp.2d at 907. The plaintiffs had been distributors for some or all of the acquired brands under distribution agreements with the two brewing companies. *Id.* Miller wanted the plaintiffs to sign new distributor agreements, which the plaintiffs found objectionable, or their distributor rights would be terminated. *Id.* The *Miller Brewing* court determined that there was not good cause for termination, in part because the notice-and-opportunity-to-cure requirements of the Beer Brewers and Wholesalers Act would be rendered meaningless if the purported good cause for terminating or canceling a wholesaler agreement was outside the control of the wholesaler. *Id.* at 910. If the cause for termination was outside the wholesaler's control, the wholesaler could not cure the cause even if given notice and an opportunity to do so. *Id.*

But, the *Miller Brewing* facts do not indicate that there was any claim that the wholesalers had breached the distributor agreements or that there was anything that the wholesalers could do, other than sign the objectionable agreements, to avoid nonrenewal. *Id.* at 907–910. That is not the case here. Therefore, we decline to follow *Miller Brewing*.

■ We conclude that good cause for nonrenewal of a dealership agreement under Minn.Stat. § 325E.0681, subd. 1, may be based on conduct by a third party that causes a dealer to fail to comply with the dealership agreement.

River Valley argues that the district court made no finding that it failed to comply with the dealership agreement. But the district court stated:

River Valley is an International truck dealership, selling vehicles that now come only with engines manufactured by Interstate's competitors. Since April 2002 River Valley has undertaken its obligation to participate in driving Detroit Diesel out of business. Neither

Interstate nor [Detroit Diesel] should be compelled to continue to sell parts at a discount or authorize warranty work to a business whose corporate objective is the economic elimination of Interstate and/or [Detroit Diesel] from the business world.

We infer from this statement a finding that continuing to represent International after it decided to no longer offer Detroit Diesel engines as an option in its trucks and complying with International's directive to promote the sale of Cummins and Caterpillar engines to customers, including existing Detroit Diesel customers, breached paragraph 2.2.1 of the dealership agreement between River Valley and Interstate.

The evidence regarding River Valley's breach of the dealership agreement and Interstate's decision to not renew its dealership agreement with River Valley is undisputed. As the district court concluded, the sale of Detroit Diesel engines is essential to Interstate's continued existence. Therefore, as a matter of law, it is reasonable for Interstate to require its dealers who represent an OEM to promote the sale of and maintain in stock OEM products equipped with Detroit Diesel engines. Although Interstate did not enforce paragraph 2.2.1 by imposing quotas or requiring specific sales promotions, the provision contemplates at a minimum that it will be an option for a dealer to equip an OEM's products with Detroit Diesel engines. International's discontinuance of the Detroit Diesel engine as an option for new International trucks made it impossible for River Valley to represent International and comply with paragraph 2.2.1.

Good cause for nonrenewal also requires that the requirement of the dealership agreement be consistently imposed on other similarly situated dealers. Minn. Stat. § 325E.0681, subd. 1. Interstate is not renewing its dealership agreement with River Valley because River Valley's representation of International prevents compliance with paragraph 2.2.1. River Valley argues that other International dealers continue to serve as Detroit Diesel dealers and cites Detroit Diesel dealer listings showing 53 International dealers across the United States who continue to operate as Detroit Diesel dealers. But paragraph 2.2.1 is part of a dealership agreement between River Valley and Interstate, and the defendant in this case is Interstate, not Detroit Diesel. The Detroit Diesel dealer listings that River Valley cites do not indicate that any of the 53 International dealers has a dealership agreement with Interstate. Under the HUEMDA, " 'equipment manufacturer' means a person, partnership, corporation, association, or other form of business enterprise engaged in the manufacturing, assembly, or *wholesale distribution* of heavy and utility equipment." Minn.Stat. § 325E.068, subd. 3 (2002) (emphasis added). Therefore, as a wholesale distributor, Interstate meets the definition of "equipment manufacturer," and the requirements of Minn.Stat. § 325E.0681, subd. 1, apply to Interstate and its dealers. The evidence that River Valley cites does not create a fact issue as to whether Interstate consistently imposed the requirements of the dealership agreement on its similarly situated dealers.

We conclude that, as a matter of law, good cause existed for Interstate to not renew its dealership agreement with River Valley.

## DECISION

The district court properly granted summary judgment for Interstate.

**Affirmed.**